IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

COLUMBIA SPORTSWEAR CO., an
Oregon corporation,

              Plaintiff,

    v.

WILLIAM FERREIRA and DEAN RURAK,

              Defendants.

Case No. 3:23-cv-000594-AB

OPINION AND ORDER

Keith Ketterling
Lydia Anderson-Dana
Kevin Flannery
STOLL STOLL BERNE LOKTING & SCHLACHTER P.C.
209 SW Oak Street, Suite 500
Portland, OR 97204

      Attorneys for Plaintiff Columbia Sportswear Co.

Timothy Resch
Brooke Eide
SAMUELS YOELIN KANTOR LLP
111 SW 5th Avenue, Suite 3800
Portland, OR 97204

      Attorneys for Defendant William Ferreira

1 – OPINION AND ORDER

Joshua Stump
Lauren Russell
DUNN CARNEY ALLEN HIGGINS & TONGUE LLP
851 SW Sixth Avenue, Suite 1500
Portland, OR 97204

      Attorneys for Defendant Dean Rurak

**BAGGIO, District Judge:**

      Plaintiff Columbia Sportswear ("Columbia") brings this case against its former

employees, Defendants William Ferreira ("Defendant Ferreira") and Dean Rurak ("Defendant

Rurak"). Columbia brings claims for conversion, breach of contract, breach of the fiduciary duty

and duty of loyalty, and misappropriation of trade secrets under both the Defend Trade Secrets

Act, 18 U.S.C. § 1836, and Oregon's Uniform Trade Secrets Act, Or. Rev. Stat. § ("ORS")

646.461. Now, Columbia and Defendants move for summary judgment. The Court held oral

argument on the Parties' motions on May 18, 2025. For the reasons that follow, the Court grants

in part and denies in part Defendant Rurak's motion for summary judgment, grants in part and

denies in part Columbia's partial motion for summary judgment, and denies Defendant Ferreira's

motion for summary judgment.

## BACKGROUND

      This case involves the tumultuous departure of two long-term employees of Columbia for

employment at a competitor brand. Defendant Rurak joined Columbia in 2008 as a senior

product manager, ultimately rising to Senior Vice President-Chief Product Officer. First Am.

Compl. ("FAC") ¶¶ 4, 40, ECF No. 61; Def. Rurak's Answer ¶¶ 4, 40, ECF No. 69. As a Senior

Vice President, Defendant Rurak supervised Defendant Ferreira, who joined Columbia in 2004.

FAC ¶¶ 2, 41; Def. Ferreira's Answer ¶¶ 31–32, ECF No. 70. Defendant Ferreira was the

Director of Global Merchandising for Columbia's Performance Hunting Gear ("PHG") and

Performance Fishing Gear ("PFG"). Def. Ferreira's Answer ¶¶ 31–32.

## I. Contracts Between Columbia and Defendants

Both Defendants signed contracts with Columbia. Defendant Rurak entered into 14

Registered Stock Unit Award Agreements ("RSUAA")[1] and a Proprietary Information and

Noncompetition Agreement ("2020 PINA") with Columbia during his employment. Def. Rurak's

Answer ¶ 49; Corrected Flannery Decl. ("Corr. Flannery Decl.") ¶ 3, Ex. 1 (RSUAA), ECF No.

109; Corr. Flannery Decl. ¶ 4, Ex. 2 (RSUAA Acceptances); Corr. Flannery Decl. ¶ 6, Ex. 4

("2020 PINA"). He also signed a General Release Agreement ("GRA") nearly two months after

he resigned. Corr. Flannery Decl. ¶ 58, Ex. 56 ("GRA"). Defendant Ferreira entered into one

contract during his employment—the 2016 Proprietary Information and Noncompetition

Agreement ("2016 PINA"). Corr. Flannery Decl. ¶ 8, Ex. 6.

### A. RSUAA

The RSUAA awarded Defendant Rurak the right to acquire Columbia's common stock.

RSUAA §1. It includes a broad nonsolicitation provision: "[T]he Recipient shall not recruit,

attempt to hire, solicit, or assist others in recruiting or hiring, any person who is an employee of

the Company" for 18 months after their employment. RSUAA § 1(i). The RSUAA further

provides that Defendant Rurak would pay Columbia the net value of stock received under the

Agreements for breach of this provision. *Id.*

///

///

---

[1] The relevant terms of all 14 RSUAA's are identical. The nonsoliciation provision is found in § 1(i) in nine of the agreements and § 1(k) of the remaining five. *See* Corr. Flannery Decl. ¶ 3, Ex. 1. For ease of analysis, the Court refers to § 1(i) in this Opinion.

B.     PINA

Defendant Rurak signed the 2020 PINA in connection with a promotion. *See* 2020 PINA

Preface. Under the 2020 PINA, Defendant Rurak has an obligation to protect Columbia's

confidential information and return that information upon termination of his employment:

> **Proprietary Information.** I agree that all Inventions I develop, and all other
> business, technical, strategic, personnel and financial information (including,
> without limitation, the identity of and information relating to customers or
> employees) I learn or obtain during the term of my employment that relate to the
> Company, its business or its anticipated business or that are received by or for the
> Company in confidence, constitute "Proprietary Information." I will hold in
> confidence and not disclose or use, except within the scope of my employment, any
> Proprietary Information. Upon termination of my employment for any reason, I will
> promptly return to the Company and not maintain access to all items containing or
> embodying Proprietary Information (including all electronic and hard copies),
> except that I may keep my personal copies of (i) my own compensation and
> personnel records and (ii) this Agreement.

*Id.* ¶ 5. The 2020 PINA also contains a nonsolicitation provision:

> **No Solicitation.** Until eighteen (18) months after the ending of my employment
> with the Company for any reason, I will not directly or indirectly encourage or
> solicit any employee or customer of the Company or any of its subsidiaries or
> affiliates to terminate their relationship with the Company or any of its subsidiaries
> or affiliates for any reason.

*Id.* ¶ 6.

Similarly, Defendant Ferriera entered into a PINA with Columbia in 2016. Defendant

Ferreira's 2016 PINA has a provision regarding confidential information nearly identical to ¶ 5

of Defendant Rurak's 2020 PINA:

> **Proprietary Information**. I agree that all Inventions I develop, and all other
> business, technical and financial information (including, without limitation, the
> identity of and information relating to customers or employees) I learn or obtain
> during the term of my employment that relate to the Company, its business, or its
> anticipated business or that are received by or for the Company in confidence,
> constitute "Proprietary Information." I will hold in confidence and not disclose or
> use, except within the scope of my employment, any Proprietary Information. Upon
> termination of my employment for any reason, I will promptly return to the
> Company all items containing or embodying Proprietary Information (including all

copies), except that I may keep my personal copies of (i) my compensation records, and (ii) this Agreement.

2016 PINA ¶ 5.

In the 2016 PINA, Defendant Ferreira also agreed to comply with Columbia's Code of Business Conduct and Ethics ("Code of Conduct"). *Id.* ¶ 15; *see also* Corr. Flannery Decl. ¶ 10, Ex. 8 ("Code of Conduct"). The Code of Conduct provides that "[f]ailing to safeguard [Columbia's] assets is a violation of the Code." Code of Conduct 16. Employees were also obligated to protect confidential information—which "includes all information relating to [Columbia] that is not publicly available or that is treated by the Company as confidential business information or trade secrets"—even after their employment ends. Code of Conduct 17; *see also* Corr. Flannery Decl. ¶ 11, Ex. 9 (Columbia Confidentiality Policy).

    C.    GRA

In late November 2022, nearly two months after he left Columbia, Defendant Rurak signed the GRA with Columbia. *See* GRA; Corr. Flannery Decl. ¶ 7, Ex. 5 at 87:11-88:6. The GRA provided that Columbia would pay Defendant Rurak his base salary during his noncompetition period, partially in exchange for Defendant Rurak's compliance with the 2020 PINA and his affirmation that he returned all company property. GRA ¶¶ 2-3, 5. Defendant Rurak agreed to repay his severance in the event of a breach of the GRA. *Id.* ¶ 6.

## II.    Defendant Rurak's Recruitment by Marolina

Defendant Rurak—while still employed with Columbia—began pursuing an opportunity to become CEO of competitor Marolina on August 4, 2022, after he was contacted by a third-party recruiter. FAC ¶ 52; Corr. Flannery Decl. ¶ 15, Ex. 13; Corr. Flannery Decl ¶ 16, Ex. 14 ("Hirsch-Wolf Dep.") 18:9-19:5; Def. Rurak's Answer ¶ 52. Marolina owns Huk and Nomad outdoor fishing and hunting gear brands. Corr. Flannery Decl. ¶ 17, Ex. 15 at 4, 13.

At the time Defendant Rurak was approached by Marolina, Huk and Nomad were on Columbia's radar as competitor brands. Corr. Flannery Decl. ¶ 9, Ex. 7 at 118:20-119:6; Corr. Flannery Decl. ¶ 19, Ex. 17 at 41:18. Defendant Ferreira was tasked by Columbia with creating a presentation comparing Marolina's Huk with Columbia's fishing brand, PFG. Corr. Flannery Decl. Ex. 7 at 121:6-13; Corr. Flannery Decl. Ex. 17 at 41:13-20; Flannery Decl. ¶ 20, Ex. 18 (Huk Presentation). Defendant Rurak requested and received a copy of this presentation prior to his first interview with Marolina on August 16, 2022. Corr. Flannery Decl. ¶ 21, Ex. 19 (Email Zoom Interview Invitation); Corr. Flannery Decl. ¶ 22, Ex. 20; Corr. Flannery Decl. Ex. 17 at 39:3-40:11. Defendant Rurak had additional interviews with Marolina in the weeks that followed. Corr. Flannery Decl. Ex. 5 at 95:8-1, 97:11-21.

As Defendant Rurak went through the interview process at Marolina, he started to transfer materials to an external hard drive called "LaCie." Corr. Flannery Decl. ¶ 23, Ex. 21 ("Crain Report") ¶¶ 11, 13-14. Defendant Rurak transferred 11 files to LaCie between August 15 and 18, 2022. *Id.* And he transferred over 3,750 files and folders from his Columbia-issued computer to LaCie between August 23 and October 24. *Id.* ¶¶ 10, 11. These files included "strategy documents, financial documents, product sheets or SmartCADs, and pricing information." *Id.* ¶ 12; Corr. Flannery Decl. ¶¶ 27-28, Exs. 25, 26; *see also* Suppl. Flannery Decl., ECF No. 110. Before August 2022, he had not used the drive in nearly two years. Crain Report. ¶ 14.

In September, Defendant Rurak asked to see Marolina's financials and its organizational chart. Corr. Flannery Decl. ¶ 31, Ex. 29. He executed a nondisclosure agreement with Marolina on September 25, 2022. Corr. Flannery Decl. ¶¶ 32-34, Exs. 30, 31, 32. He subsequently

received confidential business information from Marolina. Corr. Flannery Decl. Ex. 11 at 167:16-168:24.

Marolina's then-CEO—Edwin Lewis—traveled to Oregon to meet with Defendant Rurak on October 15, 2022. Corr. Flannery Decl. ¶ 35, Ex. 33. After their meeting, both expressed optimism and excitement about the opportunity to work together. Corr. Flannery Decl. ¶ 36, Ex. 34.

Defendant Rurak received an oral offer to become Marolina's CEO around October 17, 2022. Corr. Flannery Decl. ¶ 38, Ex. 36 (Am. Resp. Pl.'s Interrog. 9). Defendant Rurak did not disclose the offer to Columbia. Corr. Flannery Decl. Ex. 5 at 79:4-7; Corr. Flannery Decl. Ex. 11 at 217:7-19. But prior to his departure from Columbia, Defendant Rurak began moving personal documents and changing his account information. Corr. Flannery Decl. ¶ 41, Ex. 39 (forwarding emails regarding future travel from work account to personal account); Corr. Flannery Decl. ¶ 42, Ex. 40 (changing account information from Columbia email to personal email). On October 24, 2024, Defendant Rurak downloaded all his desktop files from his work computer to LaCie. Corr. Flannery Decl. Ex. 5 at 70:11-14; Crain Report ¶ 11. Many of these files were of a personal nature because Defendant Rurak used his computer for both work and personal use. Second Flannery Decl. Ex. 21 at 66:1-24, ECF No. 100; Crain Report ¶ 12. Defendant Rurak then attended a leadership meeting with other Columbia executives during his final week at Columbia where they discussed financial information and strategic plans. FAC ¶ 72; Def. Rurak's Answer ¶ 72; Corr. Flannery Dec. Ex. 5 at 92:11-13.

## III.    Defendant Ferreira's Recruitment by Marolina

When Defendant Rurak met with Lewis in October, they also discussed Marolina hiring other Columbia employees besides Defendant Rurak. Corr. Flannery Decl. Ex. 5 at 138:15-22.

Defendant Rurak specifically identified Defendant Ferreira and provided Lewis with Ferreira's cell phone number. *Id.*; Corr. Flannery Decl. Ex. 11 at 190:23-192:3, 195:23-196:17; Corr. Flannery Decl. Ex. 34. Lewis knew of Defendant Ferreira before Defendant Rurak mentioned him. Corr. Flannery Decl. Ex. 5 at 139:7-21. After their October meeting, Lewis texted: "Couldn't stop thinking about our conversation-Dean+Bill+HUK=WIN WIN." Corr. Flannery Decl. Ex. 34.

The next day, on October 16, 2022, Lewis texted Defendant Rurak asking if he had "[a]ny more thoughts on [him] contacting [Defendant Ferreira]?" Corr. Flannery Decl. ¶ 37, Ex. 35. In response to Lewis's question, Defendant Rurak reviewed Defendant Ferreira's personnel file and reported to Lewis that Defendant Ferreira had a six-month noncompetition agreement with Columbia. *Id.* Defendant Rurak also observed that it would "look really bad on me as well if [Defendant Ferreira] leaves and then I leave as well." *Id*. He cautioned Lewis that while it would not "hurt" for Lewis to call Defendant Ferreira, his outreach to Defendant Ferreira needed to be "navigated properly" so as to ensure it did not look like he had solicited Defendant Ferreira. *Id.*; Corr. Flannery Decl. Ex. 11 at 206:25-207:3.

Lewis reached out to Defendant Ferreira soon thereafter. Corr. Flannery Decl. Ex. 7 at 41:10-16 (testifying that Lewis reached out ten days before Defendant Ferreira resigned); Corr. Flannery Decl. Ex 41 (Def. Ferreira's Resp. Pl.'s Interrog. 2) (recalls having one conversation by phone with Lewis on or around October 18, 2022). Defendant Ferreira interviewed with Lewis in Atlanta on October 26, 2022. Corr. Flannery Decl. ¶ 43, Ex. 41 (Def. Ferreira's Resp. Pl.'s Interrog. 3). At the interview, Lewis had prepared an offer sheet for Defendant Ferreira for a position as Vice President of Sales. Corr. Flannery Decl. ¶ 44, Ex. 42 (Offer Sheet).

After Defendant Ferreira returned to Portland on October 27, 2022, he transferred at least 1,700 files and folders to an external hard drive called "Seagate." Crain Report ¶ 15; Corr. Flannery Decl. Ex. 7 at 26:20-24; Corr. Flannery Decl. Ex. 17 at 11:22-12:5; Def. Ferreira's Answer ¶ 78; Resch Decl. Ex B, ECF No. 81. The transferred files included the Huk presentation he had prepared earlier that year and other documents comparing Huk and Columbia's Performance Fishing Gear. Crain Report ¶¶ 17, 19. Defendant Ferreira wanted to keep these documents because he worked hard on them and was proud of his work. Third Flannery Decl. ¶ 4, Ex. 2 at 119:10-18, ECF No. 108.

Defendant Rurak and Defendant Ferreira also discussed the possibility of working for Marolina in the middle of October. Corr. Flannery Decl. Ex. 11 at 210:7-212:25. But Defendant Rurak claims that he did not react to Defendant Ferreira's news that he had been contacted by Marolina. Corr. Flannery Decl. Ex. 5 at 140:13-141:18.

## IV.    Defendants' Departures from Columbia

Defendant Ferreira resigned on October 28, 2022. Corr. Flannery Decl. ¶ 47, Ex. 45; Corr. Flannery Decl. Ex. 17 at 21:15-23:9; Corr. Flannery Decl. Ex. 11 at 208:18-22. Columbia relied on Defendant Rurak—Defendant Ferreira's supervisor—to determine whether it should enforce its noncompetition agreement with Defendant Ferreira. Corr. Flannery Decl. Ex. 45; Corr. Flannery Decl. Ex. 11 at 214:2-17. Defendant Rurak answered in the affirmative. Corr. Flannery Decl. Ex. 45, Corr. Flannery Decl. Ex. 11 at 215:5-217:6.

Defendant Rurak also accepted Marolina's offer on October 28, 2022. Stump Decl. Ex 4 at 98:18-21, ECF No. 85. He resigned that day, and his last day was November 1, 2022. FAC ¶ 89. After Defendant Rurak resigned, Columbia's Chief Human Resources Officer asked Defendant Rurak if he was involved in Defendant Ferreira's departure, and Defendant Rurak

responded that he was not. Stump Decl. ¶ 2, Ex. 1 at 38:3-39:5; Corr. Flannery Decl. Ex. 11 at

225:1-16. Both Defendants left Columbia with their respective hard drives. Corr. Flannery Decl.

Ex. 5 at 73:8-15; Corr. Flannery Decl. ¶ 24, Ex. 22 (Def. Rurak Resp. RFA 22); Corr. Flannery

Decl. ¶ 39, Ex. 37 (Def. Ferreira's Resp. RFA 17).

A few weeks later, Columbia sent Defendants copies of the 2016 and 2020 PINA to

remind them of their contractual obligations. Corr. Flannery Decl. ¶ 49, Ex. 47; Corr. Flannery

Decl. ¶ 50, Ex. 48. Defendants did not return their hard drives or any of the information

contained on the hard drives. Corr. Flannery Decl. Ex. 22 (Def. Rurak Resp. RFA 22); Corr.

Flannery Decl. Ex. 37 (Def. Ferreira's Resp. RFA 17).

Through its own internal investigation, Columbia became aware that its confidential

information had been taken by Defendants. Corr. Flannery Decl. ¶ 12, Ex. 10 at 86:4-23. It sent

demand letters to both Defendants in mid-December demanding return of the confidential

information they downloaded to their hard drives. FAC ¶ 102; Corr. Flannery Decl. Exs. 57, 58.

Defendants discussed the demands on December 17, 2022. Corr. Flannery Decl. Ex. 36 (Def.

Rurak Resp. Pl.'s Interrog. 11); Corr. Flannery Decl. Ex. 41 (Def. Ferreira's Resp. Pl.'s Interrog.

6); Corr. Flannery Decl. ¶¶ 61, 62, Exs. 59, 60. A few days later, Defendant Ferreira panicked

and deleted Columbia's files from Seagate. Corr. Flannery Decl. Ex. 17 at 11:9-19; Crain Report

¶¶ 24–25, 29-33; Def. Ferreira's Answer ¶ 105. Ultimately, both Defendants, through counsel,

provided their hard drives to a third-party vendor for evaluation in early January 2023. Second

Flannery Decl. ¶ 8, Ex. 6; Second Flannery Decl. ¶ 11, Ex. 9 ("Rurak Aff.") ¶ 5.

Defendant Rurak claims to have never reviewed the information on the hard drive after

his employment with Columbia ended. Rurak Aff. ¶¶ 4-5; Rurak Decl. ¶¶ 4-5, ECF No. 86;

Stump Decl. ¶ 6, Ex. 4 at 48:3, 86:1-21; Second Flannery Decl. Ex. 21 at 75:7-17. And, relevant

to the potential disclosure of Columbia's information, both Defendants signed nondisclosure

agreements with Marolina, promising that they have not and would not "disclose or use

confidential or proprietary information or trade secrets of any current or former employer."

Resch. Decl. ¶ 6, Ex. E, ECF No. 96; Rurak Aff. ¶ 5. According to Lewis, neither Defendant ever

disclosed any of Columbia's confidential information. Resch. Decl. ¶ 7, Ex. F (Lewis

Affirmation).

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The

moving party bears the initial responsibility of informing the court of the basis of its motion and

identifying those portions of "'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)

(quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine

issue of material fact, the burden then shifts to the nonmoving party to present "specific facts"

showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927-28 (9th

Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the

pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218

(9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v.

Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the

light most favorable to the nonmoving party. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d

1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (internal quotation marks omitted); *see also Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985) ("Even where the basic facts are stipulated, if the parties dispute what inferences should be drawn from them, summary judgment is improper.").

## DISCUSSION

Columbia brings five claims for relief in this case: (1) misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836; (2) misappropriation of trade secrets under Oregon's Uniform Trade Secrets Act ("OUTSA"), ORS 646.461; (3) conversion; (4) breach of contract; and (5) breach of fiduciary duty and duty of loyalty. The fifth claim is brought solely against Defendant Rurak.

The Parties move for summary judgment on all of Columbia's claims. Specifically, Columbia moves for summary judgment on its claims against both Defendants for breach of contract, on its claims against both Defendants for misappropriation of trade secrets, and on its claims against Defendant Rurak for breach of his fiduciary duty. Pl.'s Mot. Partial Summ. J. ("Pl.'s MSJ"), ECF No. 87. Defendant Rurak moves for summary judgment on all five of Columbia's claims. Def. Rurak's Mot. Summ. J. ("Def. Rurak's MSJ"), ECF No. 84. And Defendant Ferreira moves for partial summary judgment on Columbia's trade secrets and breach

of contract claims, arguing that there is no evidence of either misappropriation of Columbia's

trade secrets or of damages for the alleged misappropriation and breach of contract. Def.

Ferreira's Mot. Partial Summ. J. ("Def. Ferreira's MSJ"), ECF No. 80. The Court addresses each

of Columbia's claims and the Parties' respective motions on those claims below.

## I.    Misappropriation of Trade Secrets

Columbia brings claims for misappropriation of trade secrets under both the DTSA and

OUTSA. "To succeed on a claim for misappropriation of trade secrets under the DTSA, a

plaintiff must prove: (1) that the plaintiff possessed a trade secret[;] (2) that the defendant

misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage

to the plaintiff." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657–58 (9th Cir.

2020) (citing 18 U.S.C. § 1839(5)). "To establish a claim under the [OUTSA], a plaintiff must

demonstrate that (1) the subject of the claim qualifies as a statutory trade secret; (2) the plaintiff

employed reasonable measures to maintain the secrecy of its trade secrets; and (3) the conduct of

the defendants constitutes statutory misappropriation." *Acrymed, Inc. v. Convatec*, 317 F.Supp.

2d 1204, 1218 (D. Or. 2004) (citing *W. Med. Consultants, Inc. v. Johnson*, 835 F.Supp. 554 (D.

Or. 1993)).

Because the DTSA and OUTSA are similar, many courts—and the Parties in this case—

evaluate them together. *See DropzoneMS, LLC v. Cockayne*, No. 3:16-cv-02348-YY, 2019 WL

7630788, at *9 (D. Or. Sept. 12, 2019) ("Both the DTSA and the OUTSA define the terms

'improper means,' 'misappropriation,' and 'trade-secret,' and while they define the terms

differently, the differences do not appear to be substantive. . . "); *see also InteliClear*, 978 F.3d at

657 (analyzing claims under the DTSA and California's Uniform Trade Secrets Act together

"because the elements are substantially similar"). In addition, "Oregon has adopted the Uniform

Trade Secrets Act," so "the Ninth Circuit has approved of looking to 'other courts' interpretations of the Act for guidance' where 'there is no Oregon law on point.'" *DropzoneMS, LLC,* 2019 WL 7630788, at \*8 (quoting *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 972 n.1 (9th Cir. 1991)).

For the reasons set forth below, the Court finds that no party is entitled to summary judgment on Columbia's trade secrets claims. Columbia cannot demonstrate that as a matter of law Defendants misappropriated its trade secrets. Similarly, Defendants have not demonstrated that Columbia's claims fail as a matter of law on any of the challenged elements of Columbia's claim for misappropriation of trade secrets. Accordingly, the Court denies all Parties' motions for summary judgment on Columbia's claims under the DTSA and OUTSA.

A.    Whether the Documents Are Trade Secrets

Defendants both argue that the files they downloaded onto their respective hard drives do not constitute trade secrets. Def. Rurak's MSJ 11; Def. Ferreira's Resp. Pl.'s MSJ 15, ECF No. 93. Specifically, Defendant Rurak argues, "[Columbia] has not shown that it derives independent economic value from the secrecy of the information [Defendant] Rurak downloaded." Def. Rurak's MSJ 12. Defendant Ferreira argues that none of the documents are trade secrets because they contain publicly available information. Def. Ferreira's Resp. Pl.'s MSJ 15.

Under the OUTSA, a "trade secret" is defined as

> [I]nformation, including a drawing, cost data, customer list, formula, pattern, compilation, program, device, method, technique, or process that: (a) [d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (b) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

ORS 646.461(4). Similarly, under the DTSA, a "trade secret" is defined as "all forms and types of financial [and] business . . . information" that "the owner thereof has taken reasonable

measures to keep . . . secret" and that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C § 1839(3); *see also InteliClear*, 978 F.3d at 657 ("[T]he definition of trade secret consists of three elements: (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret.").

"When we evaluate whether disclosure of information destroyed its trade secret status—i.e., its independent economic value from being kept secret[—]we most often consider the degree to which the secret information confers a competitive advantage on its owner[.]" *Attia v. Google LLC*, 983 F.3d 420, 425–26 (9th Cir. 2020) (internal citations and quotations omitted). This is a fact-intensive inquiry. *See id.* at 426 ("The analysis is fact-intensive and will vary from case-to-case.") (internal brackets and quotations omitted); *Kaib's Roving R.PH. Agency, Inc. v. Smith*, 237 Or. App. 96, 103, 239 P.3d 247 (2010) ("'[T]he question of whether certain information constitutes a trade secret ordinarily is best resolved by a fact finder after full presentation of evidence from each side.'") (quoting *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003)).

Whether Columbia's documents constitute trade secrets is a fact-intensive question best left for the jury. Turning first to its claims against Defendant Rurak, Columbia identifies 18 "especially valuable documents" that Defendant Rurak took when he left Columbia. Crain Report ¶¶ 9-12; Corr. Flannery Decl. Exs. 23-28; *see also* Suppl. Flannery Decl. These documents included SmartCADs, long range business plans, and other strategy and product documents that fall within the scope of protectable information under the statutes. Crain Report ¶ 12; Corr. Flannery Decl. Ex. 5 at 110:24-113:16; *see also* 18 U.S.C. § 1839(3) (defining trade

secret as "all forms and types of financial, business, . . . [or] economic . . . information, including patterns, plans, compilations, . . . , designs, [and] prototypes, . . . ."). And Columbia presents some evidence as to the value these documents. Columbia's Rule 30(b)(6) deponent testified that these documents contained sensitive competitive data, business strategies, and information that would take millions of dollars to recreate. Second Flannery Decl. Ex. 1 at 114:7-17. At the time of her testimony, Columbia's deponent stated that they were currently spending millions to develop a strategy reflected in some of the documents. *Id.* at 116:6-11. Defendant Rurak also admitted that this information could be advantageous to a competitor. Corr. Flannery Decl. Ex. 5 at 110:24-113:16. In other words, a reasonable jury could conclude that Columbia's documents "give[] one who uses [them] an advantage over competitors who do not know of or use the trade secret."[2] *Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1090–91 (9th Cir. 1986) (applying California's UTSA and noting that elsewhere independent economic value had been defined as "competitive advantage" and did not require that the trade secret be the "only one in the market").

There is also an issue of fact as to whether the documents that Defendant Ferreira took are trade secrets. Defendant Ferreira primarily focuses on the public nature of some of the information within the documents identified by Columbia. But the public nature of some of the documents' contents does not necessarily defeat Columbia's claim for trade secret protection. *See Buffets, Inc. v. Klinke,* 73 F.3d 965, 968 (9th Cir. 1996) ("Trade secrets frequently contain

---

[2] While the evidence suggests that the documents Defendant Rurak took are trade secrets, the Court declines to grant Columbia partial summary judgment on this element of Columbia's claim. Under Oregon law, this finding is "ordinarily best resolved by the fact finder[,]" *Kaib's Roving*, 237 Or. App. at 103 (2010); *see also* Fed. R. Civ. P. 56(g) ("If the court does not grant all the relief requested by the motion it *may* enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case.") (emphasis added).

elements that by themselves may be in the public domain but together qualify as trade secrets.") (internal quotation marks omitted). In *Kaib's Roving*, for example, the Oregon Court of Appeals concluded there was a dispute of fact as to whether information was a trade secret where the plaintiff submitted affidavits attesting to the amount of time needed to compile similar data and the defendants had an affidavit stating that much of the plaintiff's information was common knowledge in the industry or could be readily obtained. 237 Or. App. at 104.

Similarly, here, there is a dispute of fact as to whether the identified documents—particularly the PFG-Huk Presentation—are trade secrets. The documents combine publicly available information, market pricing data purchased by Columbia, and Defendant Ferreira's own analysis of both Columbia's PFG brand and competitor Marolina's brand Huk. Third Flannery Decl. Ex. 2 at 135:16-24 (Defendant Ferreira testifying that he used his expertise in preparing documents, including assessing strengths and opportunities); Third Flannery Decl. Ex. 1 at 25:4-14 (Defendant Rurak testifying that the weaknesses, opportunities, and threats assessment was created by Defendant Ferreira and that Defendant Rurak would not have approved sharing this information with Huk). Because some of the evidence could be readily obtained by a competitor, a jury must decide whether the information allegedly misappropriated by Defendant Ferreira constitutes a trade secret.

B.    Misappropriation

Columbia and Defendant Rurak also disagree as to whether his act of downloading files constitutes misappropriation. Defendant Rurak argues Columbia cannot demonstrate Defendant Rurak acquired the trade secrets by improper means and that Defendant Rurak has not otherwise "accessed, used, or disclosed information that he downloaded to his hard drive." Def. Rurak's MSJ 13; Def. Rurak's Resp. Pl.'s MSJ 17, ECF No. 97. Columbia, in response, argues that there

is sufficient evidence that Defendant Rurak acquired its secrets through improper means. Pl.'s MSJ 40, 43; Pl. Resp. Defs.' MSJ 25, ECF No. 99.

Both the DTSA and OUTSA define misappropriation similarly. Under the DTSA, "misappropriation" is defined in relevant part as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C § 1839(5). Similarly, the OUTSA defines "misappropriation" as "[a]cquistion of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." ORS 646.461(2)(a). Under both the DTSA and OUTSA, "improper means" is defined to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means" and "does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6); *see also* ORS 646.461(1) ("'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or espionage through electronic or other means. Reverse engineering and independent development alone shall not be considered improper means.").

Columbia's inability to show that Defendant Rurak "used" or "disclosed" its trade secrets is not fatal to its case. Under the plain language of the DTSA and OUTSA, acquisition of a trade secret through, for example, breach of a duty to maintain secrecy can constitute misappropriation. *See* 18 U.S.C. § 1839(6); ORS 646.461(1). At least one court applying the DTSA has concluded that "transferring confidential information and trade secrets to a personal account can constitute acquisition by improper means" under certain circumstances. *eShares, Inc. v. Talton*, 727 F.Supp. 3d 482, 493–94 (S.D.N.Y. 2024) (holding that "merely accessing or downloading documents on a personal device" may not give rise to a violation of federal law, but

these actions may when combined with other unusual circumstances indicating an improper or illegitimate purpose). Here, Columbia alleges that Defendant Rurak acquired the trade secrets through improper means by transferring confidential information to his respective hard drive while pursing positions at a competitor despite his obligation to hold that information in confidence. *See* 2016 PINA ¶¶ 5, 15; 2020 PINA ¶ 5; Code of Conduct 16-17 (requiring all employees to safeguard its confidential information). In light of Columbia's allegations in this case, the Court finds that "use" or "disclosure" of the alleged secrets is not required. *See Or. Wash. Health Network v. Inspired Bus. Connections LLC*, Case No. 2:23-cv-00897-HL, 2024 WL 3411769, at *4 (D. Or. June 3, 2024) (finding the plaintiff stated a claim under the OUTSA and DTSA where they had "not allege[d] that [the d]efendants used the information," but they did "allege that it was acquired by improper means . . . .").

There is, however, a dispute of fact as to whether Defendant Rurak misappropriated Columbia's trade secrets. On one hand, at the time that Defendant Rurak downloaded the information to his hard drive, he worked for Columbia. So, he may have had a proper business reason for downloading the documents, or he may have inadvertently downloaded some of the documents among the overwhelming number of personal documents he transferred to LaCie. Second Rurak Decl. ¶ 4, ECF No. 98; Second Flannery Decl. Ex. 21 at 66:1-24. Merely downloading these documents to LaCie under these circumstances likely does not give rise to a violation of federal or state law.

On the other hand, the timing of Defendant Rurak's actions create a reasonable inference that Defendant Rurak's act of downloading the information was improper. Specifically, Defendant Rurak had a duty to maintain the secrecy of these documents. 2020 PINA ¶ 5. But he requested the PFG-Huk Presentation on the day he first interviewed for the Marolina

19 – OPINION AND ORDER

opportunity. Corr. Flannery Decl. ¶ 21 (email Zoom interview invitation); Corr. Flannery Decl. Ex. 20 (email request for presentation); Corr. Flannery Decl. Ex. 17 at 39:3-40:11. Defendant Rurak began downloading documents to LaCie after this interview and throughout the time he pursued the position with Marolina. Crain Report ¶¶ 10-14. He transferred over 3,000 documents to LaCie just days before he resigned and after having received the oral offer of employment. *Id.* He had not used the hard drive in nearly two years before he began transferring documents to the hard drive. *Id.* And he took LaCie with him when he left his employment. Corr. Flannery Decl. Ex. 5 at 73:8-15. These "unusual circumstances" are sufficient to survive summary judgment. *See eShares*, 727 F.Supp. 3d at 494 (citing cases where similar circumstances gave rise to a claim for misappropriation of trade secrets). As a reasonable jury could reach either conclusion, summary judgment is inappropriate on Columbia's claims for misappropriation of trade secrets.

Finally, Columbia also argues that it is entitled to summary judgment on this element of its trade secrets claim against Defendant Ferreira. Pl.'s MSJ 43. Defendant Ferreira does not respond to Columbia's motion for summary judgment on "misappropriation." *See* Def. Ferreira's Resp. Pl.'s MSJ 13-19. The Court, however, declines to grant partial summary judgment on this element of Columbia's claim against Defendant Ferreira. The analysis of Columbia's claim against Defendant Ferreira is similar to the analysis of the claim against Defendant Rurak. Defendant Ferreira downloaded the alleged trade secrets the night before he resigned, while he was still a Columbia employee. Crain Report ¶ 15. Many of the 1,700 documents Defendant Ferreira downloaded that day were personal. *Id.* ¶ 17, Ex. D. On this record, and in light of the caselaw described above, a reasonable jury could disagree as to whether Defendant Ferreira's actions constituted misappropriation of Columbia's trade secrets.

///

C.    Damages

Both Defendant Rurak and Defendant Ferreira argue that their conduct has not resulted in damages. Def. Rurak's MSJ 15; Def. Ferreira's MSJ 8. Specifically, they argue that Columbia's claim fails because it has not identified any damages stemming from their misappropriation of Columbia's alleged trade secrets. *Id.* Columbia disputes these arguments and, in addition, argues that it has a claim for injunctive relief. Pl.'s Resp. Defs.' MSJ 28, 37.

First, the Court declines to find that proof of damages is an element of a claim for misappropriation of trade secrets. Both statutes include injunctive relief as a remedy for threatened misappropriation. 18 U.S.C. § 1836(b)(3)(A); ORS 646.463 (injunctive relief); *see also JustMed, Inc. v. Byce*, 600 F.3d 1118, 1130 (9th Cir. 2010) ("Therefore, while damages for misappropriation of a trade secret are inappropriate here because of the lack of 'use' or 'disclosure' as contemplated in the context of trade secret protection, the district court may grant an injunction against [the defendant's] threatened use or disclosure of the source code if appropriate."). And damages are addressed in a separate section and subsection of the OUTSA and DTSA. *See* ORS 646.465 (remedies); 18 U.S.C. § 1836(b)(3)(B) (award of damages). In other words, damages are a remedy for a claim of misappropriation of trade secrets and not an element of Columbia's claim. Thus, the Court declines to find that proof of damages is required in every trade secrets case.

Second, while the Court has concerns that any claim for injunctive relief could be stale at this juncture,[3] there is a dispute of fact as to whether Columbia has been damaged by Defendants' misappropriation. Columbia has provided some evidence and argument to support a

---

[3] At oral argument, Columbia admitted that there is probably a question of "staleness" in this case as it has already been pending for two and a half years.

claim for damages. Specifically, Columbia argues that it can seek damages for its efforts spent on the return of its secrets. *See Or. Wash. Health Network,* 2024 WL 3411769, at *6 (granting motion for default judgment where the plaintiff demonstrated compensatory damages for "employee time and resources to attempt to obtain the documents and information, track down the missing information, respond to questions and demands from employees for the missing documents and information, and attempts to recreate the missing documents and information to the extent possible from other sources"). Columbia's efforts here consist of pre-litigation efforts to obtain the files that Defendants Rurak and Ferreira allegedly misappropriated. Corr. Flannery Decl. Ex. 10 at 86:4-23. Specifically, Columbia's IT team used a forensic tool to search for any unusual activities leading up to Defendants' departures. *Id.* Though there is little other evidence of damages and Defendants claim to no longer have access to Columbia's confidential information after providing their hard drives to counsel, the Court finds that Columbia has met its burden to survive summary judgment.[4]

## II.    Conversion

Defendant Rurak moves for summary judgment on Columbia's claim for conversion, arguing that (1) it is superseded by the OUTSA and (2) fails because there is no evidence Defendant Rurak modified or manipulated the alleged confidential information. Def. Rurak's MSJ 16. Because the Court agrees with Defendant Rurak that Columbia's conversion claim is superseded by the OUTSA, it dismisses Columbia's third claim for relief.[5]

---

[4] At this point in the litigation, the Court declines to resolve the Parties' arguments about exemplary damages under the DTSA because exemplary damages are only recoverable if Columbia is awarded compensatory damages. *See* 18 U.S.C. § 1836(b)(3)(C) ("[I]f the trade secret is willfully and maliciously misappropriated, award exemplary damages in an amount not more than 2 times the amount of the damages awarded under subparagraph (B).]").

[5] Although Defendant Ferreira did not move for summary judgment on this theory, the Court's finding that Columbia's claim is superseded as a matter of law applies equally to both

The OUTSA supersedes "conflicting tort, restitution or other law of Oregon providing civil remedies for misappropriation of a trade secret." ORS 646.473(1); *see also* ORS 646.473(2)(b) (emphasizing that the OUTSA does not affect "[o]ther civil remedies that are not based upon misappropriation of a trade secret"). Several judges in this district have concluded that the OUTSA preempts a claim for conversion where the claims "are based on the same operative facts as a claim for trade secret misappropriation under the [OUTSA]." *Select Timber Prods. LLC v. Resch*, No. 3:17-CV-00541-HZ, 2017 WL 3709066, at *4–5 (D. Or. Aug. 27, 2017) (citing *Precision Automation, Inc. v. Tech Servs., Inc.*, No. 07-CV-707-AS, 2007 WL 4480736, at *2 (D. Or. Dec. 14, 2007)).

In *K.F. Jacobsen & Co. v. Gaylor*, however, the district court concluded that a claim for conversion was not preempted by the OUTSA in ruling on a motion to dismiss. 947 F.Supp. 2d 1120, 1127 (D. Or. 2013). There, the plaintiff alleged that the defendant "'misappropriated and converted to his own use the confidential *and* proprietary information of plaintiff.'" *Id.* (emphasis added). The plaintiff also alleged the defendant had in his possession and control "a large number of misappropriated documents, 'some of which may be additional misappropriated trade secrets of plaintiff or confidential and proprietary information of plaintiff . . . .'" *Id.* The court found that the term "'confidential and proprietary information' could be construed broadly enough to include information that does not fall within the definition of a 'trade secret'" such that the plaintiff's claim for conversion was not preempted by the OUTSA. *Id.* ("[T]o the extent [the plaintiff's] Fourth Claim for Relief for conversion seeks damages for the conversion of information other than trade secrets, it is not preempted by the Trade Secrets Act.").

---

Defendants. *See* Supplemental Br. 1-2 (discussing the claims against both Defendant Rurak and Defendant Ferreira in asserting that Columbia "will contend that each misappropriated document that it introduces into evidence is a trade secret"), ECF No. 112

Here, by contrast, Columbia's claims for trade secret misappropriation and conversion are based on the same operative facts. Indeed, Columbia does not dispute that the same facts underlie both claims: "[Columbia] will contend that each misappropriated document that it introduces into evidence is a trade secret. . . . [Columbia] will not pursue a stand-alone theory of conversion based on non-trade-secret documents." *See* Supplemental Br. 2, ECF No. 112. In its briefing, Columbia argues only that conversion is an alternative theory of relief that should be available if the jury finds that the documents are not trade secrets or were not misappropriated. *See* Pl.'s Resp. Defs.' MSJ 40 ("CSC seeks to recover for Defendants' conversion of its files only to the extent that the jury determines that particular files did not constitute trade secrets or that Defendants did not misappropriate files.") (quoting Pl.'s Mot. Am. Compl. 12, ECF No. 45); *see also* FAC ¶ 21 ("CSC brings claims against Ferreira and Rurak for conversion of its confidential information, to the extent that such claims are not displaced by Oregon's Uniform Trade Secrets Act."). But in light of the cases discussed above, the Court disagrees with Columbia that it can proceed on its conversion claim as an alternative theory of relief. As Columbia does not seek damages for conversion of any information on than its trade secrets, the Court finds the OUTSA preempts Columbia's claim for conversion in this case.[6] *See Acrymed, Inc.,* 317 F.Supp. 2d at 1217 ("Where the essence of the claim relates primarily to the alleged misappropriation of a trade secret, the claim is displaced by the preemptive language of the Act.").

---

[6] In the alternative, Columbia argues that a finding that the OUTSA preempts Columbia's conversion claim would violate the Remedy Clause in Article I, Section 10 of the Oregon Constitution. This is a complex analysis to which Columbia has devoted only one sentence in its response and supplemental briefs as it pertains to the conversion claim. Pl. Resp. Defs.' MSJ 40; Supplemental Br. 2. In light of the case law discussed above and Columbia's limited briefing on this issue, the Court declines to address it further.

### III.     Breach of Contract

Columbia and Defendants both move for summary judgment on Columbia's claim for breach of contract.[7] To establish a breach of contract claim under Oregon law, the plaintiff "must allege the existence of a contract, its relevant terms, plaintiff's full performance and lack of breach[,] and defendant's breach resulting in damage to plaintiff." *Slover v. Or. St. Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570, 927 P.2d 1098 (1996) (internal quotation omitted). As explained below, there is no dispute of fact that: (1) Defendant Ferreira breached ¶ 5 and ¶ 15 of the 2016 PINA; (2) Defendant Rurak breached the nonsolicitation provisions in ¶ 6 of the 2020 PINA and § 1(i) of the RSUAA; and (3) Defendant Rurak breached ¶ 5 GRA regarding the return of Columbia's property. Summary judgment, however, is inappropriate on the issue of damages and Defendant Rurak's breach of ¶ 5 of the 2016 PINA.

#### A.     Defendant Ferreira

Columbia moves for summary judgment on the merits of its claims against Defendant Ferreria, arguing that he breached provisions of the 2016 PINA requiring him to safeguard proprietary information and abide by Columbia's Code of Conduct. Pl.'s MSJ 35. Defendant Ferreira also moves for summary judgment on this claim, arguing that Columbia's claim fails because it cannot prove damages. Def. Ferreira's MSJ 12.

---

[7] Columbia repeatedly argues in its briefing that Defendants have breached the relevant contracts in ways not alleged in the First Amended Complaint. Specifically, Columbia argues that Defendant Ferreira breached the noncompetition provisions of the 2016 PINA, that Defendant Rurak breached the noncompetition provisions in the 2020 PINA and GRA, and that Defendant Rurak breached the nonsolicitation provisions in the GRA. Pl.'s MSJ 26-31, 37. Columbia also argues that Defendant Ferreira breached his duty of good faith and fair dealing under the 2016 PINA. *Id.* at 36. And Columbia argues that Defendant Rurak breached his duty of good faith and fair dealing under the RSUAA by withholding information about Defendant Ferreira's solicitation and departure. *Id.* at 27-28. As none of these theories of breach were alleged in the First Amended Complaint, *see* FAC ¶¶ 155-72, the Court declines to address them further.

The 2016 PINA states, in relevant part:

> I will hold in confidence and not disclose or use, except within the scope of my employment, any Proprietary Information. Upon termination of my employment for any reason, I will promptly return to the Company all items containing or embodying Proprietary Information (including all copies), except that I may keep my personal copies of (i) my compensation records and (ii) this agreement.
>
> . . . .
>
> **Code of Business Conduct and Ethics.** The Columbia Sportswear Company Code of Business Conduct and Ethics (the "Code") sets out basic principles to guide me in my dealings with or on behalf of Columbia. I acknowledge that I have reviewed the Code and I understand and agree to comply with the standards that are applicable to me.

2016 PINA ¶¶ 5, 15. "Proprietary Information" is defined as "all . . .  business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees) I learn or obtain during the term of my employment that relate to the Company, its business, or its anticipated business or that are received by or for the Company in confidence . . . ." *Id.* ¶ 5. The Code of Conduct requires employees to safeguard company assets—such as confidential information—against misuse, damage, and loss. Code of Conduct 16-17.

There is no dispute that (1) this is a valid contract (2) Columbia performed under the contract and did not breach the agreement; and (3) as admitted at oral argument, that Defendant Ferreira breached this contract insofar as he failed to return—and ultimately deleted—proprietary information he took with him on his last day of employment. Thus, the sole dispute here is whether Columbia suffered damages.

In its briefing, Columbia suggests that its damages arise out of the noncompetition provisions of the 2016 PINA. Columbia suggests that a breach of the proprietary information provisions of the 2016 PINA should require Defendant Ferreira to return any severance

payments received under the noncompetition provision of the agreement. Pl.'s MSJ 37 ("The result of [Defendant] Ferreira's disregard of. . . his specified contractual . . . duties to [Columbia] is that [Columbia] has not received the benefit of its bargain."); Pl.'s Resp. Defs.' MSJ 11 (suggesting that Columbia can "recover its payments to" Defendant Ferreira). The Court disagrees.

> The 2016 PINA includes a noncompetition provision that states, in relevant part:

> If the Company elects to enforce this six month post-termination non-competition period, the Company agrees to pay me a monthly payment equal to my last monthly salary for the six month period after termination of employment, payable on the first day of each month. The Company also has the option to shorten the non-competition period to less than six months. If it chooses to do so, I will only receive payments for the time the non-competition period is in force.

2016 PINA ¶ 8. The 2016 PINA does not otherwise include any damages provision, nor does it explicitly state that Defendant Ferreira would lose his severance payments for breach of any portion of the agreement, including ¶ 8. Moreover, Columbia has not demonstrated how these alleged damages—the total amount of severance paid—are connected to or arise out of the alleged breach of the confidentially provisions of the 2016 PINA. *See Yamaha Store of Bend, Inc. v. Yamaha Motor Corp.,* 310 Or. 333, 344, 798 P.2d 656 (1990) ("For more than a century, the general rule in Oregon in assessing damages has been that a plaintiff should recover only such sums as will compensate a plaintiff for the injury suffered as a result of a defendant's wrong."), *modified on other grounds,* 311 Or. 88 (1991). Accordingly, the Court agrees with Defendant Ferreira that, under the plain language of the contract, breach of ¶ 5 of the 2016 PINA does not result in damages equivalent to the full amount of severance paid under ¶ 8.

> Columbia has otherwise provided no evidence as to any other damages it may have suffered from Defendants Ferreira's breach. Instead, it argues that a jury should decide the value of its damages. Pl.'s Resp. Defs.' MSJ 12. Elsewhere, however, it has argued that there are

damages related to its attempts to recover its confidential information after Defendants resigned. *See supra* Part I(C); Pl.'s Resp. Defs.' MSJ 28. These are an appropriate type of damages in a breach of contract action. *See Thomsen v. School District No. UH7J*, 32 Or. App. 249, 254, 573 P.2d 1265 (1978) (allowing recovery of expenses incurred in seeking new employment in a breach of contract action). The Court, therefore, finds that summary judgment is inappropriate on this claim.

### B.    Defendant Rurak

Columbia alleges that Defendant Rurak breached (1) the nonsolicitation provisions of the RSUAA and 2020 PINA, (2) a promise to return proprietary information under the 2020 PINA, and (3) a promise that he had returned all of Columbia's property under the GRA. FAC ¶¶ 155-72. Defendant Rurak argues Columbia cannot prove breach or damages for these claims. Def. Rurak's MSJ 18-23; Def. Rurak's Resp. Pl.'s MSJ 7, 10.

### i.    Breach of the Nonsolicitation Provisions of the RSUAA and 2020 PINA

Columbia argues that Defendant Rurak's actions with regard to Defendant Ferreira constitute breaches of the nonsolicitation provisions of the 2020 PINA and RSUAA. Both agreements contain broad provisions barring solicitation of Columbia's employees:

> *No solicitation.* The Recipient agrees that for 18 months after the Recipient's employment with the Company terminates for any reason, with or without cause, whether by the Company or the Recipient, the Recipient shall not recruit, attempt to hire, solicit, or assist others in recruiting or hiring, any person who is an employee of the Company, or any of its subsidiaries.

RSUAA § 1(i).

> **No Solicitation.** Until eighteen (18) months after the ending of my employment with the Company for any reason, I will not directly or indirectly encourage or solicit any employee or customer of the Company or any of its subsidiaries or affiliates to terminate their relationship with the Company or any of its subsidiaries or affiliates for any reason.

2020 PINA ¶ 6.

Given their breadth, the Court finds that no reasonable jury could conclude that Defendant Rurak did not breach these nonsolicitation provisions. When Defendant Rurak met with Lewis in October, Defendant Rurak specifically identified Defendant Ferreira as another employee to consider recruiting. Corr. Flannery Decl. Ex. 5 at 138:15-22; Corr. Flannery Decl. Ex. 11 at 190:23-192:3, 195:23-196:17. Although Lewis knew of Defendant Ferreira before this conversation, Defendant Rurak facilitated their connection by providing Lewis, Marolina's former CEO, with Defendant Ferreira's contact information. Corr. Flannery Decl. Ex. 5 at 139:7-21; Corr. Flannery Decl. Ex. 34. Defendant Rurak does not dispute these facts. Thus, even viewing the facts in the light most favorable to Defendant Rurak, there is no reasonable dispute that he "assist[ed] [Marolina] in recruiting or hiring" Defendant Ferreira or "indirectly encourage[d] or solicit[ed]" Defendant Ferreira in violation of each agreement.

      ii.    **Breach of Promise to Safeguard and Return Confidential Information under the 2020 PINA and GRA**

Columbia also alleges Defendant Rurak breached his promises to return Columbia's confidential information. Both the 2020 PINA and the GRA have provisions requiring the return of proprietary information and company assets:

> I will hold in confidence and not disclose or use, except within the scope of my employment, any Proprietary Information. Upon termination of my employment for any reason, I will promptly return to the Company and not maintain access to all items containing or embodying Proprietary Information (including all electronic and hard copies), except that I may keep my personal copies of (i) my own compensation and personnel records and (ii) this Agreement.

2020 PINA ¶ 5.

> **Company Property.** You represent that you have returned all company property, including without limitation all data bases, customer information, pricing information, customer lists, Company documents, data, computers, electronically

stored information of any kind, equipment, keys, card keys, credit cards, cellular phones, and any other Company property.

GRA ¶ 5.

Here, there is a dispute of fact as to whether Defendant Rurak breached the 2020 PINA, but there is no dispute that Defendant Rurak breached the GRA. Turning first to the 2020 PINA, ¶ 5 requires that Defendant Rurak "promptly return . . . and not maintain access to" Columbia's proprietary information. Defendant Rurak held on to the hard drive until early January, when he provided LaCie to his legal counsel and a third-party vendor for evaluation. Second Flannery Decl. Exs. 6, 9. This occurred just a few weeks after he received notice from Columbia that he may be in the possession of confidential information. Corr. Flannery Decl. Exs. 57, 58. While Defendant Rurak admitted at his deposition that he did not comply with ¶ 5 of the 2020 PINA, he further explained that he breached it by "taking materials from the company." Second Flannery Decl. Ex. 21 at 83:1-7. Viewed in the light most favorable to Defendant Rurak, this statement does not constitute an admission to breach of ¶ 5, which requires the prompt return of confidential information. Whether Defendant Rurak's return of the documents two months after the termination of his employment was "prompt" is for the jury to decide.

As to the GRA, however, there is no dispute that at the time that Defendant Rurak signed the GRA in November he had not returned all of Columbia's property.[8] *Cf.* GRA ¶ 5 ("You represent that you have returned all company property[.]"). His possession of confidential materials on LaCie was in breach of ¶ 5 of this Agreement. Defendant Rurak admitted as much at

---

[8] Defendant Rurak also suggests in his Motion for Summary Judgment that he should be excused from his breach of the GRA because he did not review the agreement with legal counsel or discuss any specific components of the agreement. Def. Rurak's MSJ 20. This is not a defense to breach of contract in this case. *See Knappenberger v. Cascade Ins. Co.*, 259 Or. 392, 398, 487 P.2d 80 (1971) (holding a party's failure to read or understand a contract is no defense to enforcement of the contract absent special circumstances).

his deposition. Second Flannery Decl. Ex. 21 at 91:2-5 (answering "No" to the question "[w]as your representation in paragraph 5 [of the GRA] accurate and true as of the date you signed [the GRA]?"). Accordingly, the Court finds Defendant Rurak breached the GRA.

iii.    Damages

Columbia and Defendant Rurak dispute whether Defendant Rurak's alleged breaches caused damage to Columbia. There are three issues presented by the Parties' briefing. First, the Court must determine whether Columbia can use the damages provision of ¶ 6 of GRA as a basis for damages for breach of the 2020 PINA. *See* Pl.'s MSJ 28-30. Second, Defendant Rurak argues that ¶ 6 of the GRA and § 1(i) of the RSUAA are unlawful liquidated damages provisions under Oregon law. Def. Rurak's Resp. Pl.'s MSJ 10-12. Third, Defendant Rurak argues that Columbia has otherwise failed to show sufficient evidence of damages as a result of Defendant Rurak's breaches of these agreements. *Id.* at 12-13. While the Court agrees with Defendant Rurak on the first issue, issues of fact otherwise preclude summary judgment on Columbia's breach of contract damages.

a.    Damages Pursuant to ¶ 6 of the GRA

Turning to the first issue, the Court finds that Columbia's claim that it can recover damages for breach of the 2020 PINA through the GRA fails because it is not alleged in the complaint. *See* Pl.'s MSJ 28-29. Specifically, Columbia argues now that repayment of Defendant Rurak's severance pursuant to ¶ 6 of the GRA is an available remedy for breach of the 2020 PINA because ¶ 2 of the GRA incorporates the 2020 PINA. *See id.*; *see also* GRA ¶ 2 ("You represent that you are and will continue to comply with . . . all other obligations in [the 2020 PINA], including without limitation your obligations of confidentiality and non-solicitation."). In other words, breach of the 2020 PINA is a breach of ¶ 2 of the GRA, triggering the damages

provision in ¶ 6 of the GRA. Columbia, however, has not alleged that Defendant Rurak breached ¶ 2 of the GRA in its complaint. *See* FAC ¶¶ 155-72. Accordingly, this theory of damages for breach of the 2020 PINA fails.

b.      Liquidated Damages

As to the second issue, the bulk of the damages Columbia identifies in its briefing stem from damages clauses in the relevant contracts, which Defendant Rurak argues are unlawful liquidated damages provisions. Def. Rurak's Resp. Pl.'s MSJ 10-12. "Oregon courts use a two-part inquiry to determine whether a contract provision is an unlawful liquidated damages clause." *Wells Fargo Bank, N.A. v. The Ash Org*., No. 09-CV-188-MO, 2010 WL 2681675, at *9 (D. Or. July 2, 2010). First, the court must determine "whether the disputed clause is actually a liquidated damages clause." *Id.* (quoting *Kesterson v. Juhl*, 157 Or. App. 544, 548, 970 P.2d 681 (1998)). Then, it must determine whether the liquidated damages provision is an unlawful penalty. *Id.*

A liquidated damages provision gives the nonbreaching party the right to recover an agreed sum of money in the event of a breach. *DiTommaso Realty, Inc. v. Moak Motorcycles, Inc.*, 309 Or. 190, 195, 785 P.2d 343 (1990). Where a contract involves a liquidated damages provision, the Court applies three criteria to determine whether that provision is lawful. The agreed sum must be reasonable considering: (1) "the anticipated or actual harm caused by the breach"; (2) "the difficulties of proof of loss"; and (3) "the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy." ORS 72.7180(1); *see also Wright v. Schutt Construction Co.*, 262 Or. 619, 624-25, 500 P.2d 1045 (1972) ("[A] contract provision for liquidated damages will not be declared to be a penalty because the stipulated amount to be paid as damages is more than the amount of the actual damages unless the stipulated amount is

'grossly disproportionate,' or has no 'reasonable relation' to the probable loss, as anticipated at the time of the contract."), *disapproved of on other grounds by DiTommaso*, 309 Or. at 195-96. "A term fixing an unreasonably large liquidated damages is void as a penalty." ORS 72.7180(1). The opponent has the burden of proving that the challenged provision is unlawful. *Dean Vincent, Inc. v. McDonough*, 281 Or. 239, 249, 574 P.2d 1095 (1978) *disapproved of on other grounds by DiTommaso*, 309 Or. at 194.  The validity of a liquidated-damages provision is a question of law only if the facts are undisputed or capable of only one conclusion. *Foster v. Peterson*, 42 Or. App. 249, 257-58, 600 P.2d 490 (1979).

In *Kesterson*, the Oregon Court of Appeals found that a damages provision was an unlawful liquidated damages provision. 157 Or. App. at 549. There, the dispute involved a declaratory judgment claim about the enforceability of a fee in a loan that required timely payment within six months. *Id.* at 547. In assessing the validity of the provision, the court first concluded that the damages provision calling for payment of $102,000 to the defendant in the event of an untimely payment was a liquidated damages provision. *Id.* at 548. It then determined that the provision was unlawful. *Id.* at 549. In so finding, the court emphasized that there was "no evidence of defendant's actual or anticipated harm" other than the broad claim in the agreement that the defendant would suffer hardship in the event of an untimely repayment. *Id.* There was also "no evidence as to the difficulty of proving loss to the defendant or the inconvenience or unfeasibility of obtaining an alternate remedy." *Id.* Thus, on the record before it, the court concluded that the damages provision was invalid and unenforceable and the trial court had erred in granting summary judgment to the defendant. *Id.*

By contrast, in *Allstream Business US, LLC v. Carrier Network Solutions, LLC*, the court concluded that a damages provision was lawful in resolving a motion for a default judgment.

Case No. 3:20-cv-01970-IM, 2021 WL 3488086 (D. Or. Aug. 9, 2021). There, the contract imposed a monthly $150,000 charge—totaling nearly $10 million total—in the event of the early termination of a contract. *Id.* at *9. The court found that the clause was a liquidated damages provision because it set the amount of damages in the event of a failure to perform by a party to the contract. *Id.* The court concluded that the significant amount of damages was reasonable because it was based on the minimum monthly payment the plaintiff could have expected from the defendant and was tied to the remaining term of the contract. *Id.* In its decision, the court also emphasized that there it would be difficult or inconvenient to prove loss because of "the length of the contract term, the unpredictable invoice amounts, and varying costs to provide services." *Id.* Accordingly, it granted the plaintiff's request for default judgment for the amount of the liquidated damages. *Id.*

At the first step of the analysis, the Court finds that both provisions are liquidated damages provisions. The GRA provides: "In the event that you breach this Agreement you shall be required to repay any compensation provided under the Agreement, and the Company may seek any remedy available under applicable law." GRA ¶ 6. The RSUAA similarly provides: "In addition to other remedies that may be available to the Company, the Recipient shall pay to the Company in cash, upon demand, the net value of any shares of Common Stock, valued as of the vesting date, delivered under this Agreement if the Recipient violates this section 1(i)." RSUAA § 1(i). Thus, both the RSUAA and the GRA give Columbia the right to recover an agreed sum of money—$245,299.99 under the GRA and $537,324.33 for under the RSUAA, FAC ¶¶ 169, 171—in the event of a breach. Because the terms award damages for "fail[ing] to perform as agreed," *DiTommaso*, 309 Or. at 195 (quotations and citation omitted), these are liquidated damages provisions under Oregon law.

There are, however, disputes of fact that must be resolved before the Court can determine whether the liquidated damages provisions in the RSUAA and GRA are unlawful penalties at the second step of the analysis. Namely, whether the liquidated damages provisions are enforceable will ultimately depend on evidence of the anticipated or actual harm caused by the breach, difficulties Columbia faces in proving loss, and the inconvenience or nonfeasability of obtaining an adequate remedy. ORS 72.7180(1). These liquidated damages provisions appear to be significant when compared to what little evidence Columbia has submitted thus far of its injury. *See supra* Part I(C). But Columbia has also argued that it faces difficulty proving its losses or otherwise obtaining an adequate remedy in this case. Thus, the Court finds it premature at this juncture to find the provisions are unlawful as a matter of law.[9]

Columbia made an alternative argument in its briefing and at oral argument that the sought-after damages—return of the payments made under the agreements—are not liquidated damages but are restitution damages. Pl.'s Reply MSJ 11, ECF No. 107. Specifically, it argued at oral argument that courts frequently allow a party to a contract to "get their money back" when a party does not get the benefit of its bargain. *See also id.* ("[Columbia] has a straightforward claim for the return of . . . those payments and the value of those stock awards based on [Defendant] Rurak's failure to perform as promised.") The Court disagrees. Generally, under Oregon law, a party can either pursue a claim for breach of contract and seek damages or they can bring a claim for recission and restitution. *See Snyder v. Rhoads,* 47 Or.App. 545, 554, 615

---

[9] The Court, however, has significant concerns about the lack of evidence regarding damages—an element of Columbia's claim for breach of contract—in light of the condensed case schedule in this case. Trial was set to begin only two months from oral argument on these motions. And, given Columbia's discovery responses in the record, the Court is also concerned that Columbia has not provided adequate notice of its damages for Defendants to conduct discovery on this issue.

P.2d 1058 (1980) ("[A] party induced by misrepresentation to enter into a contract has an election of remedies; he may rescind the contract and be entitled to return of any consideration he has parted with or he may affirm the contract and sue for damages."); *Eulrich v. Snap-On Tools Corp.*, 121 Or. App. 25, 41, 853 P.2d 1350, 1361 (1993) ("[A] party may not affirm and rescind a contract at the same time."), *judgment vacated on other grounds,* 512 U.S. 1231 (1994).

While Columbia argues that its cited cases suggest the broader availability of restitution damages, *see* Pl.'s Reply MSJ 11, the case Columbia cites involving the application of Oregon law merely suggests that restitution may be available in the event of a total breach and rescission of a contract:

> Any voluntary affirmative act of a party which renders substantial performance of his contractual duties impossible, or apparently so constitutes a total breach (1 Restatement, Contracts, s 318, p. 475) and warrants a suit seeking cancellation and restitution (2 Restatement, Contracts s 347, comment e.) . . . . When one party repudiates a contract or commits a total breach thereof, the injured party has an election to pursue one of three remedies; he may treat the contract as at an end and sue for restitution, he may sue for damages, or he may sue for specific performance in certain cases.

*E.H. Boly & Son, Inc. v. Schneider*, 525 F.2d 20 (9th Cir. 1975) (quoting *Mohr v. Lear*, 239 Or. 41, 48, 395 P.2d 117 (1964)). But Columbia does not allege or argue that there was a total or substantial breach of any of the agreements. *See Koch v. Sky Tech, Inc.*, 263 Or. 425, 434-35, 502 P.2d 1367 (1972) (finding a substantial or total breach "defeat[s] the object of the parties in making the contract"). Indeed, beyond seeking return of the severance payments and the value of the stock given to Defendant Rurak under the RSUAA, Columbia does not expressly seek rescission or restitution in its complaint. *See generally* FAC. Thus, without more, the Court declines to find that Columbia is entitled to restitution damages for Columbia's breach of

contract claims. *See Logan v. D.W. Sivers Co.*, 343 Or. 339, 354, 169 P.3d 1255 (2007) (limiting the plaintiff's recovery to those expenses arising out of the breach).

c. Other Evidence of Damages for Breach of Contract

Finally, Defendant Rurak argues that Columbia has not suffered damages resulting from his conduct. Def. Rurak's Resp. Pl.'s MSJ 12-13. As with the claim against Defendant Ferriera, Columbia has made little effort to otherwise prove the amount of its damages for breach of these agreements. Columbia, however, may be able to show some amount of nonspeculative damages arising out of these breaches at trial. Columbia argues that it is entitled to recover costs associated with the loss of Defendant Ferreira and for costs related to recovering its confidential information. Pl.'s Reply MSJ 11; *see supra* Part I(C). The Court finds that this is sufficient at this juncture to survive summary judgment. *Cf. Sharma v. Providence Health & Servs.-Or.*, 289 Or. App. 644, 657-58, 412 P.3d 202 (2018) (granting summary judgment where there was "no evidence . . . from which a juror could directly, or by reasonable inference, find that plaintiff suffered contract damages from the alleged breaches of the employment agreement by Providence").

## IV. Breach of Fiduciary Duty

To succeed on a claim for breach of a fiduciary duty, Columbia must show: (1) the existence of a fiduciary relationship; (2) a breach of a fiduciary duty arising out of that relationship; and (3) damage to Columbia resulting from that breach. *Giuliano v. Anchorage Advisors LLC*, 19 F.Supp. 3d 1087, 1103 (D. Or. 2014) (citing *Evergreen W. Bus. Ctr., LLC, v. Emmert,* 254 Or. App. 361, 367, 296 P.3d 545 (2012), *rev'd on other grounds,* 354 Or. 790, 323 P.3d 250 (2015)). Whether a fiduciary relationship exists depends on "'whether the nature of the

parties' relationship itself allowed one party to exercise control in the first party's best interests.'" *Id.* (quoting *Bennett v. Farmers Ins. Co.*, 332 Or. 138, 161-62, 26 P.3d 785 (2001)).

Columbia and Defendant Rurak raise two questions regarding Columbia's breach of fiduciary duty claim. The first is whether Defendant Rurak owes a fiduciary duty to Columbia. The second is whether Defendant Rurak breached that duty. As discussed below, Court finds that issues of fact preclude summary judgment on either issue. Accordingly, Columbia's and Defendant Rurak's motions for summary judgment are denied as to Columbia's fifth claim for relief.

A.    The Existence of a Fiduciary Duty

The Parties dispute whether Defendant Rurak, as Senior Vice President-Chief Product Officer, owed a fiduciary duty to Columbia. Specifically, Defendant Rurak argues that because he was not a corporate officer or director, he does not owe a fiduciary duty to Columbia. Def. Rurak's MSJ 23-24.

As a preliminary matter, the Court notes that the cases that Defendant Rurak cites do not stand for the proposition that *only* corporate officers owe fiduciary duties to Columbia. Rather, the those cases involve an employer's fiduciary duties to an employee, *Hoffman v. Donahue*, 136 Or. App. 26, 28-29, 900 P.2d 531 (1995), and how to determine whether an individual is a corporate officer under Oregon's worker's compensation laws, *SAIF Corp. v. Cox*, 133 Or. App. 666, 671, 893 P.2d 553 (1995). There is no bright line rule under Oregon law. Rather, the Court determines whether a special relationship gives rise to a fiduciary duty on a case-by-case basis, focusing "on whether the nature of the parties' relationship itself allowed one party to exercise control in the first party's best interests." *Bennett v. Farmers Ins. Co. of Or.*, 332 Or. 138, 161–62, 26 P.3d 785 (2001); *see also Aitkin v. USI Ins. Servs., LLC*, 607 F.Supp. 3d 1126, 1150 (D.

Or. 2022) (finding "[a]n employee, as an agent of their employer, owes a duty of loyalty to the principal-employer" until the employee's "termination of employment"); *Alexander & Alexander Benefits Servs. Inc. v. Benefit Brokers & Consultants, Inc.*, 756 F.Supp. 1408, 1412 (D. Or. 1991) (describing the contours of the duty of loyalty for employees under Oregon law).

      While Defendant Rurak was not listed as a corporate officer or director in Columbia's 2021 Form 10-K, Stump Decl. Ex. 10 at 9, and he claims that he never had a voice in directing the policy of the company, Rurak Decl. ¶ 1, a reasonable jury could conclude that Defendant Rurak had a special relationship with Columbia and could exercise control in its best interest. Defendant Rurak admits in the pleadings that he was part of Columbia's senior leadership team, FAC ¶ 174; Def. Rurak's Answer ¶ 174, and was involved in decisions about "pricing, product mix, architecture, innovations, and distribution," FAC ¶¶ 41-43; Def. Rurak's Answer ¶¶ 41, 43 (admitting to allegations that Defendant Rurak was "responsible for [Columbia's] product creation engine" and was "intimately involved in decisions surrounding [Columbia's] pricing, product mix, architecture, innovations, and distribution."). Thus, there is a dispute of fact as to whether Defendant Rurak owed a fiduciary duty to Columbia.

      B.    Breach of Defendant Rurak's Fiduciary Duty

      Columbia moves for summary judgment on the merits of Columbia's claim for breach of Defendant Rurak's fiduciary duty. First, Columbia argues that Defendant Rurak breached his fiduciary duty by helping Marolina recruit Defendant Ferreira. Pl.'s MSJ 33. Second, Columbia contends Defendant Rurak breached his fiduciary duty by failing to disclose his conflict with Marolina while he was pursuing that opportunity. *Id.* at 34. Defendant Rurak also moves for summary judgment on these claims, arguing that his conduct does not constitute a breach of his fiduciary duty as a matter law. Def. Rurak's MSJ 24.

Turning to Columbia's first argument, neither party is entitled to summary judgment on this claim. Judges in this district have concluded that soliciting other employees to accept employment at a competitor may constitute breach of a fiduciary duty. *See Isosceles Holding, LLC v. All. Env't Grp., LLC*, No. 3:23-CV-01004-AN, 2023 WL 4947866, at *12 (D. Or. Aug. 3, 2023) (finding that "encourage[ing] . . . employees to resign and accept employment at" a competitor could constitute a breach of a fiduciary duty of loyalty); *Am. Republic Ins. Co. v. Union Fid. Life Ins. Co.*, 295 F.Supp. 553, 555 (D. Or. 1968) (finding the defendant breached his duty of loyalty "when, while still employed by [the plaintiff], he encouraged other . . . employees to join him in moving to" a competitor); *Alexander & Alexander Benefits Servs., Inc. v. Benefit Brokers & Consults., Inc.*, 756 F.Supp. 1408, 1412 (D. Or. 1991) (same). However, "it is normally permissible for employees of a firm, or for some of its partners, to agree among themselves, while still employed, that they will engage in competition with the firm at the end of the period specified in their employment contracts." *Alexander & Alexander*, 756 F.Supp. at 1412.

Here, Defendant Rurak took various steps to assist Marolina in recruiting Defendant Ferreira. Though Lewis knew of Defendant Ferreira prior to his conversation with Defendant Rurak, Corr. Flannery Decl. Ex. 5 at 139:7-21, Defendant Rurak specifically identified Defendant Ferreira as an employee Marolina might hire and provided Lewis with his cell phone number, Corr. Flannery Decl. Ex. 11 at 190:23-192:3, 195:23-196:17; Corr. Flannery Decl. Ex. 34. Defendant Rurak reviewed Defendant Ferreira's personnel file before telling Lewis that it would not "hurt" for him to reach out to Defendant Ferreira but noting it needed to be "navigated properly" so that it would not look as though he had solicited Defendant Ferreira. Corr. Flannery Decl. Ex. 35. Defendants then discussed the possibility of working for Marolina in October while

still employed by Columbia. Corr. Flannery Decl. Ex. 11 at 210:24-212:25. As Lewis knew of Defendant Ferreira prior to meeting with Defendant Rurak and Defendant Rurak never directly encouraged Defendant Ferreira to leave Columbia, a reasonable jury could conclude that Defendant Rurak did not breach his duty of loyalty. Alternatively, a reasonable jury could conclude Defendant Rurak was instrumental in recruiting Defendant Ferreira, thus breaching his duty of loyalty to Columbia. Whether these facts constitute a breach of Defendant Rurak's duty of loyalty is inappropriate for summary judgment.

As to Columbia's second argument, the Court again finds that there is a dispute of fact as to whether Defendant Rurak breached his fiduciary duty by failing to disclose his new position with Marolina. Generally, an employee's decision to withhold information about his departure from an employer is not, on its own, a breach of an employee's duty of loyalty: "Oregon law generally favors the freedom of employees to choose where they work." *Aitkin v. USI Insurance Servs*, 607 F.Supp. 3d at 1151 ("[N]othing prevents an employee under contract from seeking other employment."). Though a verbal job offer was extended to Defendant Rurak in mid-October, Defendant Rurak took time to consider the offer and did not want to disclose the new position to Columbia until he accepted the role. Second Flannery Decl. Ex. 21 at 80:9-18. Defendant Rurak resigned just hours after formally accepting the Marolina position. Stump Decl. Ex 4 at 98:18-21; FAC ¶ 89. On these facts, a reasonable jury could conclude that Defendant Rurak's decision to pursue another employment opportunity, interview over the course of a few months, and resign hours after he accepted his new position was not a breach of his duty of loyalty. *See Konecranes, Inc. v. Scott Sinclair*, 340 F.Supp. 2d 1126, 1132 (D. Or. 2004) ("Ordinarily, absent a valid non-compete agreement, an employee can resign in the morning and be working for a competitor the same afternoon.").

Columbia, however, also alleges that Defendant was a key employee at Columbia who misappropriated its trade secrets during the course of his interview process. For example, he sought out confidential information about Huk and Columbia immediately before to his first interview with Marolina, and he downloaded thousands of documents during the months he was interviewing for the CEO position at Marolina. Corr. Flannery Decl. Ex. 19 (email Zoom interview invitation); Corr. Flannery Decl. Ex. 5 at 95:8-1, 97:11-21; Crain Report ¶¶ 10-14. A reasonable jury could infer from these facts that Defendant was engaged in anticompetitive behavior during his final months at Columbia and find Defendant Rurak breached his fiduciary duty by using confidential information to secure a job with a competitor. *Cf. Alexander & Alexander*, 756 F.Supp. at 1412 ("Even before the termination of the agency, he is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein."). Accordingly, summary judgment is denied on this claim.

///

///

///

///

///

///

///

///

///

///

42 – OPINION AND ORDER

## CONCLUSION

The Court GRANTS in part and DENIES in part Defendant Rurak's Motion for Summary Judgment [84], DENIES Defendant Ferreira's Motion for Partial Summary Judgment [82], and GRANTS IN PART and DENIES IN PART Columbia's Partial Motion for Summary Judgment [87]. The Court grants Defendants summary judgment on Columbia's third claim for relief for conversion. The Court also grants Columbia partial summary judgment on its breach of contract claims.

IT IS SO ORDERED.

DATED this _28th_ day of May, 20_25_.

*Amy M. Baggio*
_____
AMY M. BAGGIO
United States District Judge